Madden, Judge,
delivered the opinion of the court:
The plaintiff sues to recover money which, it says, the Government illegally “recaptured” from it in connection with a ship subsidy contract between the plaintiff and the Government. Only the plaintiff’s right to recover is pres *697 ently before us. The amount of the recovery, if any, has been reserved for further proceedings.
The Merchant Marine Act of 1936,49 Stat. 1985, 46 U.S.C. §§ 1101-1294, authorized the Government, in certain circumstances, to pay subsidies to American ship operators in order to make their operations competitive with those of foreign operators whose costs of operation are substantially lower than those of American operators. But in order to insure that subsidized operations would not be unreasonably profitable to the operators, section 606(5) of the 1936 Act, 46 U.S.C. § 1176(5) provided for the recapture by the Government of one-half of the net profits earned by a subsidized operator in any 10-year “recapture period”, which net profits are in excess of 10 percent per annum of the “capital necessarily employed” by the subsidized operator. Section 607(d) of the 1936 Act, 46 U.S.C. § 1177(d), provided that “capital necessarily employed” should be defined by regulation of the United States Maritime Commission, which was the Government agency charged with the administration of the 1936 Act.
Since, under the statute, the ship operator could keep his profits up to the amount of 10 percent of the “capital necessarily employed” but had to give the Government one-half of all profits above that ten percent, it is apparent that the amount of the “capital necessarily employed” is a factor of the greatest importance in the administration of the ship subsidy contracts. And, as we have seen, the statute authorized the Maritime Commission to define, by regulation, how that key factor should be determined.
The initial subsidy contracts, made soon after the enactment of the 1936 Act, provided that the capital necessarily employed by the operator was his net worth. In 1940 the Commission, by General Order No. 31, formally defined the factor as net worth.
There were 12 operators of ships, including the plaintiff, who had subsidy contracts made in the years 1937 and 1938. The outbreak of the war greatly increased the profits of the subsidized lines, and correspondingly increased their net worth. In 1940 the Commission decided, in principle, that the definition of capita] necessarily employed ought to be *698 changed. However, it had issued no regulation changing General Order No. 81 when the United States entered the war and requisitioned all merchant vessels, thus suspending all subsidized operations.
Although subsidized operations were suspended, the existing subsidy contracts were kept alive by the conditional extension of their termination dates, so that subsidized operations could be resumed after the war. The operators had received large amounts of money for the requisition by the Government of their ships, and for insurance on ships sunk, and had had no opportunity to invest it in new ships, until some time after the war.
The Maritime Commission authorized the renewal of subsidized operations on January 1,1947, provided that all conditions which the Commission might impose were agreed to and incorporated into the subsidy contracts. A subsidy contract with a particular operator includes a great amount of detail with regard to the types of ships to be used, trade routes, minimum and maximum sailings and many other items. Hence, although subsidized operations were permitted to be resumed on January 1,1947, the first actual signing of the amended contracts did not occur until about January 1, 1950. From January 1, 1947, then, the subsidized operators were working without contracts, and on faith that satisfactory contracts would ultimately be made, and made effective as of January 1, 1947.
It will be remembered that the recapture of one-half the profits of subsidized operators, in excess of 10 percent of return on capital necessarily employed, was to be computed on the basis of 10-year periods. The 12 operators which had made their contracts in 1937 and 1938, which contracts were kept alive, though under suspension, during the war, were still, on January 1,1947, within their ten-year recapture-of-profits period. And either their contracts as written, or General Order No. 31 issued in 1940, defined their capital necessarily employed as their net worth.
At the end of the war, for the reasons mentioned above, the operators were long on cash and securities and short on ships, hence the net worth definition allowed them to retain 10 percent of profits computed on large amounts of capital *699 not really employed in tlie shipping industry. The staff of the Maritime Commission in 1946 proposed to the Commission a supplement to General Order No. 31 which would have eliminated many items of cash and securities from the factor of capital necessarily employed, and would have been effective January 1,1947. The operators objected to the change, chiefly on the ground that they were holding the cash and securities for the purpose of acquiring ships as soon as ships were available. The Commission rejected the definition proposed by its staff.
A new definition, still more disadvantageous to the operators, was proposed to the Commission in 1949. It was adopted by the Commission as General Order No. 71. It provided effective dates ranging from December 31, 1947, to December 31, 1950, for the various operators, and, a matter of great importance, it allowed the net worth factor of General Order No. 31 to remain applicable, for each operator, during the ten-year recapture period which had begun in 1937 or 1938 when the operator began its subsidized operation.
The promulgation of General Order No. 71 on December 21,1949, made possible the closing of subsidy contracts with those operators as to which the other details of their contracts had been agreed upon. Five contracts were executed within two weeks, two more early in 1950, and one in March 1951. This accounted for eight of the twelve subsidized operators. These eight operators got the advantage, then, of the net worth factor from January 1,1947, the date of their resumption of subsidized operations, to the date later in 1947 or in 1948 when their original ten-year recapture period had expired. From the date of the end of their recapture period, these operators would have their capital necessarily employed factor determined by the new and less favorable definition contained in General Order No. 71.
In the early part of 1950 there was vigorous criticism of the Maritime Commission by the General Accounting Office and by the House of [Representatives Committee on Expenditures in the Executive Departments. One ground of criticism was the Commission’s failure to make the new definition, more favorable to the Government, of capital *700 necessarily employed, which, new definition was contained in General Order No. 71, applicable to all subsidized operators from January 1,1947, instead of from the dates of expiration of their ten-year recapture periods.
On May 24,1950, the Maritime Commission was abolished and its functions were transferred to the Federal Maritime Board and the Maritime Administration. The Board referred the problem of capital necessarily employed to its staff. The staff requested the eight operators whose new contracts provided that General Order 31 should continue to apply to their operations until the end of their recapture period, to consent to a roll-back of the General Order 71 definition to January 1,1947. The operators refused to consent. There was extensive study by the staff and negotiation with the operators. In April 1951, the Board approved a staff recommendation that the four operators whose contracts had not yet been executed be required to agree, in their contracts, that after the contracts had been made the Board should still have the power to modify the terms of General Order No. 71, including its effective date, and apply the modified terms to these four operators.
The operators, apparently all of them, protested both the legality and the equity of the proposal. They knew that the purpose of the proposal was to get from the four operators contractual consent to a roll-back to January 1,1947, if the Board should decide to make that date the effective date of General Order No. 71.
Two of the remaining four operators, one in June and the other in August, 1951, waived subsidy payments for the period from January 1, 1947, to the end of their recapture periods. That left only the plaintiff and Oceanic Steamship Line with their contracts unsettled.
A hearing, with oral argument, on the staff proposal to amend General Order No. 71, was held on July 11,1951. The shipping industry opposed the proposal on the ground that it would be retroactive and discriminatory. More than a year later, on September 17, 1952, the Board announced its decision. The decision was to make the order effective, as of January 1, 1947, for those operators whose subsidy contracts were executed after April 30,1951. The plaintiff and *701 Oceanic would be tbe only operators answering that description.
Tbe Board, in its decision, said that it could not apply the roll-back to tbe eight operators with which the Commission had signed contracts, because that would violate their contracts and also violate the Congressional objective of a “fair measure of stability” in subsidy contracts. It said that equality of treatment of all the subsidized operators would be desirable but that the fact that contractual rights prevented the roll-back as to the operators with whom contracts had been completed could not be permitted to compel the Board to apply to the operators who did not have contracts a rule which, in the opinion of the Board, should not have been applied to any of the operators.
We now narrate the course of dealing between the plaintiff and the Commission, and later the Board. The plaintiff, after the war, resumed commercial operations in 1946, and, subject to the anticipated subsidy contract, resumed subsidized operations on January 1, 1947. In February 1947, the Commission assured the plaintiff that, subject to the making of the necessary findings and determinations as to routes, sailings, competitors’ costs, etc., the Commission would be able to act on the plaintiff’s contraer “at an early date.” Similar assurances were made to the plaintiff in 1948, 1949, and 1950. During the years 1947-1951 the plaintiff took many actions, including construction, purchase, and chartering of ships, on the assumption that it was a subsidized operator. It complied with all the obligations of a subsidized operator, but it could not actually collect any subsidy payments because its contract had not been executed. On May 18,1949, the Commission sent the plaintiff a 13-page letter reciting the terms which the plaintiff’s contract would contain. The Commission requested the plaintiff to show its agreement by endorsement on a copy. The plaintiff answered by a letter in which it pointed out the need for minor changes in route descriptions and annual sailings and, except for these suggestions, agreed to the Commission’s proposed contract. The Commission’s staff later described the plaintiff’s letter as an acceptance, with certain reservations, of the Commission’s proffered contract. That proffered contract *702 included the application of the General Order No. 31 net worth definition of capital necessarily employed.
A letter similar to the Commission’s letter of May 13,1949, was sent by the Commission to Moore-McCormack Lines, Inc. on February 11, 1950. Moore-McCormack endorsed a copy, but noted that it was sending separately a request for revision of route descriptions and sailing schedules. The Board on March 8, 1951, gave Moore-McCormack a contract including the application of General Order No. 31 down to the end of that company’s ten-year recapture period. The Board said that its correspondence with Moore-McCor-mack made an informal but nonetheless binding contract. There was, in fact, no significant difference between the situations of the plaintiff and Moore-McCormack as regarded the incompleteness of their contracts at the time that the Board succeeded to the Commission on May 24,1950.
Among the causes for delay in completing the plaintiff’s subsidy contract were the computation of foreign-flag costs, a hearing on the right to carry intercoastal traffic, doubts as to whether there was enough foreign-flag competition to warrant subsidy on the trans-Pacific passenger liners, differences of opinion within the Government on the proper construction-differential subsidy rate for vessels being constructed or improved by the plaintiff, and discussions as to the plaintiff’s vessel replacement program.
On April 3,1951, the Board approved a staff recommendation as to the terms of the plaintiff’s contract, including a clause to the effect that the plaintiff agreed to any change in General Order No. 71, including its effective date. A more refined draft was completed on July 16, 1951. That draft, and the final contract, contained an Article 1-14 (c)(1) which provided:
(1) The Operator agrees to accept any changes by the United States in the definition of the term “Capital Necessarily Employed * * *” as set forth in General Order 71 * * *, including, without limitation, changes with respect to the effective date of said definition; * * *.
On July 20 the plaintiff’s president protested that the provisions of the quoted article were unfair. On September 18, *703 1951, the Board’s secretary sent the contract to the plaintiff for execution, and wrote that “As of this date the * * * Board has not rendered a decision concerning General Order 71.” That meant that although the plaintiff, in signing the contract, would be agreeing that the Board should have the power to make the onerous terms of General Order No. 71 retroactive, even back to January 1,1947, the Board had not yet decided whether or not to exercise that power. The plaintiff was hopeful that the Board would not exercise the power.
Almost a year later, on September 17, 1952, the Board made its decision, making General Order No. 71 applicable to the plaintiff for the period January 1, 1947, to September 30, 1948, i.e., from the date of resumption of subsidy operations to the end of the plaintiff’s ten-year recapture period under its original subsidy contract. It will be remembered that the comparable period for eight of the subsidized operators had been permitted to be governed by the net worth definition of General Order 31. The plaintiff’s profits were recaptured on the basis of the retroactive application of General Order No. 71 to the period in question, and the plaintiff was obliged to pay back some $300,000 more than it would have had to pay if General Order No. 31 had been applied. The instant suit is for the amount of the allegedly excessive recapture, but the present phase of the suit concerns only the question of liability.
Our question is whether the retroactive application by the Maritime Board of the Maritime Commission’s modified definition of “capital necessarily employed” was, in the circumstances recited above, illegal. The plaintiff says that it was illegal because it was discriminatory and was unreasonably retroactive.
We think the Board’s action with regard to the plaintiff was illegally discriminatory. A legislature, or an administrative agency authorized by the legislature to issue regulations having the force of law, may make classifications based upon rational differences in the situations of parties classified differently. In the instant case there were 12 operators which resumed subsidized operations on January 1, 1947. The Commission, and each of the operators, acted on the as *704 sumption that as soon, as the complicated details of an appropriate subsidy contract could be worked out with, each operator, a formal agreement would be made which would give that operator the benefits of having been a subsidized operator from January 1, 1947. The length of time necessary to work out the details of each operator’s contract would depend upon the size and complexity and peculiar characteristics of the operation.
As we have seen, none of the operators were able to sign their completed contracts before the early part of 1950. The last of the eight operators which were given more advantageous treatment than the plaintiff was given, signed its contract on March 8,1951. The plaintiff signed its contract on October 5, 1951. In the plaintiff’s contract was the Article 1-14 (c) which gave the plaintiff’s consent to the Board’s power to later make General Order No. 71 effective retroactively, if the Board decided to do so. Except for this contractual provision, there was no difference between the plaintiff’s situation and that of the eight operators who received different treatment. The Board in its explanation of its action, not taken until September 17, 1952, made no suggestion that there was any difference in shipping economics or practice, or route, financing, or operation, to justify its difference of treatment.
The Board’s treatment of Moore-McCormack, narrated in finding 54, differently from the plaintiff, although all the relevant facts in the two situations were substantially the same, indicates confusion on the part of the Board.
A consideration of the conduct of the Board, in its entirety, persuades us that the pressure of the criticism by the House Committee and the General Accounting Office caused it to search out some situation in which it could make a gesture in the direction of yielding to its critics, without an obvious violation of rights. It justified its preferential treatment of the eight operators, not only on the ground that they had contract rights but, as the Board said in its 1952 roll-back amendment, a roll-back as to the eight operators would be
action in violation of the express Congressional intent that holders of operating subsidy contracts should thereby obtain “a fair measure of stability” in the governmental policy as embodied in such contracts.
*705 The plaintiff bad, from January 1, 1947, been operating as a subsidized operator, recognized as sucb by the Commission and the Board, and complying with all the legal requirements laid down for such an operator. Yet not until September 17,1952, did the Board determine what the plaintiff was entitled to, with regard to the vital provision of the statute relating to “capital necessarily employed”, which would control the amount of the plaintiff’s profits which the Government would be entitled to recapture.
We think that the Board’s motive, of attempting to partially satisfy its critics by applying to the plaintiff and one other operator, Oceanic, a rule which it did not apply to any other ship operator, similarly situated, was not a legally permissible motive for official action. The administration of a statute cannot be carried on like horse-trading or haggling in a market place for private trading. What one can be induced to agree to, after he has become deeply involved with the Government by several years of action based upon reasonable assumptions, cannot impair his right under the statute to non-discriminatory treatment, and freedom from unreasonably retroactive treatment.
The administration of our maritime laws has been difficult, and conscientious administrators have been subject to criticism from within the Government, and to pressure from the industry. This court has had occasion to determine, in disregard of these criticisms and pressures, the rights of parties under these statutes and other applicable legal principles. We have held that one who has a right under a statute, or under a legal doctrine implicit in a statute, does not effectively surrender that right by making a contract about it. A. H. Bull Steamship Company v. United States, 123 Ct. Cl. 520 (1952), and Southeastern Oil Florida, Inc. v. United States, 127 Ct. Cl. 409 (1953). Other cases in this court applying comparably relevant principles are Clapp v. United States, 127 Ct. Cl. 505 (1954) and Suwannee S.S. Corp. v. United States, 150 Ct. Cl. 331 (1960).
Our conclusion is that the combination, in the instant case, of unjustified discrimination and unreasonable retroactivity invalidated the Maritime Board’s attempted roll-back of the effective date of the definition of “capital necessarily em *706 ployed”, embodied in General Order No. 71. The plaintiff is, therefore, entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Pule 38 (c).
It is so ordered.
Dureee, Judge; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
FINDINGS OF FACT

Contents Findings

I. JURISDICTION_ 1-4
A. General _ 1
B. Tlie Parties_ 2-3
O. Tlie Severance of Issues- 4
II. THE CONTENTIONS_ 5-17
A. Summary Statement_ 5-15
B. Plaintiff’s Contentions_ 16
C. Defendant’s Contentions_ 17
HI. THE ACT, THE CONTRACT, AND THE REGULATIONS_18-25
A. The Act_ 18
B. The Contract_19-22
C. The Regulations_23-25
IV.NARRATIVE_26-52
A. 1937 through 1945_26-29
B. 1946 through 1949_30-34
C. 1950 through 1952_35-52
V.CONCLUSIONS_53-55
A. Maritime_ 53
B. Moore-McCormaek _ 54
C. Plaintiff_ 55
VI.APPENDIX_ 56
i. jurisdiction
A. General
1. (a) The gravamen of the complaint is an alleged breach of contract. Jurisdiction is therefore predicated upon 28 U.S.C. § 1491.
(b) Involved are: (1) an operating differential subsidy contract and several addenda thereto, culminating in a “re *707 sumption addendum” which, contained a complete revision of the original contract; (2) portions of the Merchant Marine Act of 1936; and (3) regulations issued by the responsible administrative agencies.
B. The Parties
2. (a) The plaintiff, American President Lines, LtcL (sometimes hereinafter referred to as APL), was formerly the Dollar Steamship Lines, Inc., Ltd. (sometimes hereinafter referred to as Dollar).[1]
(b) Dollar began the operation of transpacific steamship services in 1901 and added round-the-world service in 1924. In 1939, APL initiated a service from the Atlantic coast to the Malay Straits.
(c) The transition from Dollar to APL occurred in 1938, following a financial reorganization incident to which some 92 percent of the voting stock of the corporation was transferred to the United States Maritime Commission.
(d) Beginning in 1945, extensive litigation ensued over the nature of the stock transfer. A settlement was reached in June 1952, pursuant to which the stock was offered for sale, with the proceeds to be divided equally between the Government and the former owners of the stock. The sale was made in October 1952.
(e) All of the services in controversy were operated by APL. They fall into two categories: (1) prewar (1938-1942), when APL operated combination passenger-cargo sailings (approximately fortnightly) between California and the Far East and westbound round-the-world; and (2) postwar (1947-1952), when APL operated one freighter and one combination passenger-cargo service between California and the Far East, and the westbound round-the-world service.
3. The responsible administrative agencies are hereinafter usually referred to as Maritime. They include (1) the United States Maritime Commission, created by section 201 (a) of the Merchant Marine Act of 1936;[2] (2) the Federal Maritime Board, created by [Reorganization Plan 21 of *708 I960;[3] and (3) the (similarly created) Maritime Administration.
C. The Severance of Issues
4. The parties have stipulated, with the approval of the commissioner, that the present proceeding is limited to the issues of law and fact relating to the right of the plaintiff to recover, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings.
II. THE CONTENTIONS
A. Summary Statement
5. (a) APL was one of 12 operators of steamship services with which the Maritime Commission entered into operating differential subsidy contracts in 1937 and 1938.
(b) As required by statute, each of these contracts provided for recapture by Maritime, “at the end of any ten-year period during which an operating differential subsidy has been paid,” of one-half of the amount by which the operator’s profits exceeded 10 percent of its “capital * * * necessarily employed.”
(c) APL’s contract began on October 1, 1938, wherefore the expiration of its 10-year period was fixed at September 30,1948.
6. (a) All of Maritime’s contracts provided that “capital necessarily employed” would “be determined upon the basis of * * * net worth * *
(b) The statute authorized Maritime to define “capital necessarily employed” by regulation. Such a regulation (General Order 31) was issued on June 11,1940. Insofar as material here, it also defined capital necessarily employed in terms of net worth.
7. (a) During the years 1938, 1939, and part of 1940, the profits of the subsidized operators were no larger than had been anticipated when capital necessarily employed was defined in terms of net worth. This situation changed abruptly during the second half of 1940, when European shipping became preoccupied with the war and withdrew much of the foreign flag competition. American flag vessels began to *709 show rapid and substantial increases in profits, from which concomitant increases in net worth were soon reflected.
(b) Maritime’s prospects of recapture from subsidized operators, based on profits in excess of 10 percent of net worth, decreased proportionately as the net worth of the subsidized operators increased.
(c) In July 1941, a Maritime staff recommendation urged modification of General Order 31 in partial recognition of the situation. The recommendation was never put into effect by Maritime.
8. (a) Early in 1942, a general requisition of merchant vessels for war purposes put an end to the operation of subsidized services and the payment of subsidies.
(b) Instead of canceling the subsidy contracts, Maritime extended them “conditionally,” thereby keeping them alive subject to “resumption” after the war.
9. (a) At the end of the war, changed conditions made it apparent that Maritime would have to restudy many of the ingredients of the operating differential subsidy contracts, including such basic elements as “essential services,” the qualifications of vessels (in-being and to-be-built), and the costs of operation by foreign flag competitors of American vessels.
(b) In order to avoid a postwar hiatus in the operation of vessels under the subsidy program pending completion of the necessary studies, Maritime authorized and the operators agreed to the resumption of operations pending agreement upon conditions later to be incorporated in the resumption contracts. Such conditional postwar resumption of subsidized operations was begun on January 1,1947.
10. (a) APL’s original contract was first extended to December 31,1943, then for 6 months (to June 30,1944), then for 1 year (to June 30,1945), then again at 6-month intervals to December 31,1946.
(b) The Sixteenth Addendum to the APL contract, dated June 29,1946 (extending the contract to December 31,1946), provided that capital necessarily employed should be determined as provided by General Order No. 31 “as amended from time to time.”
*710 (c) Thereafter, by three additional addenda, the APL contract was extended to December 31,1947.
(d) On December 9, 1947, Maritime again extended the APL termination date to June 30,1949. This extension was accomplished by administrative action. It was not incorporated in a formal addendum.
(e) On March 21, 1949, Maritime (again by administrative action) authorized an amendment to the APL contract, “* * * to be a complete revision * * * and to include * * * an extension of the term * * * to September 30,1958 * * *.”
(f) On October 5, 1951, APL and Maritime entered into an .agreement “as of January 1, 1947,” identified in the evidence as Contract FMB-12, which comprised the postwar “resumption addendum” of plaintiff’s original operating differential subsidy agreement.
11. (a) Maritime adopted General Order 71 on December 29, 1949. The purport of the order was to modify the concept of net worth, as contained in General Order 31, in such manner as to enhance the recapture by Maritime of the excess profits of the operators.
(b) General Order 71 specified its effective date as (1) “* * * the day next following the termination of the recapture period which was current on December 31, 1946, with respect to an operating differential subsidy contract then effective” and (2) “with respect to an operating differential subsidy contract made after December 31, 1946, * * * the date specified in the contract as the effective date thereof.”
12. APL Contract FMB-12 (dated October 5, 1951) contained the following provisions:
(1) That for purposes of the recapture of excess profits “this agreement shall be deemed to have continued without interruption from October 1, 1938, and the initial period of recapture of excess profits shall expire September 30, 1948. * *
(2) That “notwithstanding any provisions to the contrary * * * the Operator agrees to accept any changes by the United States in the definition of the term ‘Capital Necessarily Employed * * *’ ,as set forth in General Order 71 * * * *711 including, without limitation, changes with respect to the effective date of said definition.” [4]
(3) That “‘capital necessarily employed * * *’ * * * shall, with respect to all * * * accounting periods which terminated * * * with or prior to * * * the recapture period which was current on December 31, 1946, be determined as provided in * * * General Order * * * 31 * * * exclusive, however, of the provisions of General Order 71.”
(4) That “with respect to all * * * accounting periods terminating subsequent to the * * * [above] and in the case of contracts taking effect on or after January 1,1947, the provisions of General Order * * * 71 * * * defining * * * ‘capital necessarily employed ***’*** shall be controlling, and the provisions of General Order * * * 31 * * * shall be applicable only to the extent that such provisions are consistent with the provisions of General Order * * * 71 * * * 55
13. On September 17,1952, Maritime adopted Amendment 1 to General Order 71 which (1) further modified the definition theretofore given of capital necessarily employed and (2) replaced the original effective date provisions with the following:
(1) With respect to an operating differential subsidy addendum executed prior to May 1,1951, the effective date (of General Order 71) to be “the day next following the termination of the recapture period which was current on December 31,1946.”
(2) With respect to a resumption addendum executed after April 30, 1951, the effective date (of General Order 71) to be January 1, 1947.
(3) With respect to an operating differential subsidy contract executed after December 31,1946, the effective date (of General Order 71) to be the effective date of the contract.
14. (a) The effect of Amendment 1 of General Order 71, upon the two operators to whom it applied, was to roll back the application of its definition (which, from the operators’ standpoint, was a less favorable definition) of capital necessarily employed from the end of the recapture period (which, *712 in plaintiff’s case, was September 30, 1948) to January 1, 1947.
(b)Tbe difference in accumulations of subsidies payable to plaintiff, by virtue of the rollback, is alleged to have been of the order of $300,000. Maritime withheld the difference, and plaintiff now demands its payment.
15. (a) Following the adoption of General Order 71 on December 29,1949, the execution of resumption addenda was begun. By the end of March 1951, 8 of the 12 prewar operators had signed.
(b) As the terms of the resumption addenda became known, interested committees of the Congress and the Comptroller General renewed their criticism of Maritime for its failure to apply more stringent standards to the recapture of the operators’ excess profits.
(c) Maritime reviewed the situation and concluded (1) that as to the eight resumption addenda already signed, no changes could lawfully be made; (2) that as to those operators who had not signed resumption addenda, changes could be made; (3) that Maritime was not yet ready to say either that changes should be made, or, if made, what the new conditions should be; and (4) that in the meantime, saving clauses would be inserted in up-coming resumption addenda binding the operators to accept revisions of the effective date of General Order 71 if, as, and when Maritime should order them.
(d) Clauses hereinabove identified as I-14-c provisions were accordingly inserted in resumption addenda prepared for signature after May 1,1951.
(e) Two of the four operators to whom the rollback might have applied reached accommodation with Maritime on another basis. The rollback therefore applied only to plaintiff and one other operator. Plaintiff, alone, is now contesting the action.
B. Plaintiff’s Contentions
16. Plaintiff contends:
(1) That it is, and since October 1, 1938 (the date of its original operating differential contract with Maritime) con tinuously has been, a subsidized operator.
*713 (2) That the agreement between the parties expressly provides (and ever since the execution of the Sixteenth Addendum on June 29, 1946, has provided) for the application of General Order 31 to the recapture period, January 1, 1947, to September 30,1948.
(3) That its reliance upon these contract provisions, from January 1, 1947, to October 5, 1951, was substantial, although not critical.[5]
(4) That article I-14-c of Contract FMB-12 was ineffective to destroy the promise of Article II-29-b.
(5) That Amendment 1 to General Order 71 is discriminatory and therefore unlawful.[6]
(6) That the invalidity of the provision (Amendment 1 to General Order 71) was not cured by plaintiff’s agreement (in 1-14 — c) to accept changes in the effective date of General Order 71 because (a) the parties did not, in the adoption of I-14-c, either contemplate or provide for the acceptance of a regulation otherwise unlawful, and (b) if they had so contemplated and attempted to provide, they could not, by their agreement, effectively validate an unlawful regulation.[7]
C. Defendant’s Contentions
17. Defendant contends:
(1) That plaintiff’s contractual rights are confined to those contained in the agreement of October 5, 1951.[8] (The addenda to the prewar contract are classified as agreements to make a future contract.)
*714 (2) That plaintiff never, at any time relevant to this litigation, had a contractual right to the application of General Order 31.[9]
(3) That Amendment 1 to General Order 71 is a reasonable and legally valid administrative regulation; and that it is not so tainted by discrimination as to be unlawful, because (a) the parties (the two operators to whom the regulation applied and the eight operators to whom it was not applied) were not similarly situated; (b) the difference in treatment (if any) was reasonable; (c) there was no binding contract prior to October 5, 1951 (since there was no meeting of minds between APL and Maritime) ; and (d) the application of the provision retroactively was reasonable.
in. THE ACT, THE CONTRACT, AND THE REGULATIONS
A. The Act
18. Eelevant provisions of the Merchant Marine Act of 1936[10] are set forth below in finding 56. They include (1) the policy statement of section 101; (2) the creation of the Maritime Commission by section 201(a); 1(3) the mandate of section 211 to the Maritime Commission to investigate, determine, and keep current records of stated elements deemed essential to the development, maintenance, and administration of the subsidy programs; (4) the provisions of title VI (sections 601, 602, 603, 606, and 607) pertaining to operating differential subsidy contracts, including requirements pertaining to the maintenance of capital and special reserve funds and the recapture of excess profits.
B. The Contract
19. The original operating differential subsidy contract between the Maritime Commission and APL was dated October 6,1938.[11] Pertinent provisions follow:
*715 2. Period, of the Agreement. Except as otherwise provided herein the agreements of the Operator hereunder shall be applicable to the entire period from and including September 25, 1938 to and including September 24, 1943.
*****
C. Determination and Payment of Subsidy.
28. Calculation of Amount. Subject to the provisions for adjustments and revision herein set forth and to all other terms and conditions of this agreement, the Commission agrees to pay to the Operator, if and when such payments shall become due hereunder, as an operating-differential subsidy sums not in excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, over the estimated fair and reasonable cost of the same items of expense if such vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this agreement.
*****
36. Recapture of Excess Profits. At the end of the calendar year 1948, at the expiration of each subsequent ten year period, and upon the termination of this agreement, the Commission shall determine the amount of the net profit of the Operator on its subsidized vessels and services incident thereto during the period from the commencement of this agreement or the expiration of the preceding ten year period after deduction of depreciation charges based upon a twenty-year life expectancy of the subsidized vessels. If such net profit has averaged more than 10 per centum per annum upon the Operator’s capital investment necessarily employed in the operation of the subsidized vessels, services, routes, and lines, the Operator shall pay to the Commission an amount equal to one-half of such profits in excess of 10 per centum per annum as partial or complete reimbursement for operating-differential subsidy payments received by the Operator for such period, but the amount of excess profits so recaptured shall not in any case exceed the amount of the operating-differential subsidy payments theretofore made to the Operator for such period under this agreement, and the repayment of such reimbursement to the Commission shall be subject to the provisions of Section 607 of the Act and Article 34 hereof.
* * * * *
37. Definitions. * * *
*716 (b)“Capital necessarily employed i/n the business” or “capital investment necessarily employed in the operar tion of the subsidized vessels, services, routes, and lines” shall be determined upon the basis of the net worth reported by Operator in its balance sheet as at December 31,1987, adjusted as hereinafter provided.
20. (a) Between the date of its execution and September 30,1947, the foregoing contract was amended by 19 separate addenda. The first 10 of these addenda antedated the entry of the United States into World War II; the next 4 addenda were made during the progress of hostilities; and the last 5 addenda were made after the war.
(b) Article 2 of the contract (making “* * * the agreements of the Operator * * * applicable * * * from * * * September 25, 1938 to * * * September 24, 1943” was amended by 10 of the foregoing addenda,[12] carrying forward the termination date to December 31, 1947, as hereinafter described.
(c) The Eleventh Addendum, dated September 24, 1943, added to Article 2 of the contract the following paragraph:
This Agreement is conditionally extended to December 31,1943, provided, however, that if on or before said date there shall not have been executed by the Commission and the Operator an agreement further extending the period of this Agreement and containing satisfactory provisions for such further extension, including requirements as to a replacement program or the making of provisions therefor, then this Agreement shall be deemed to have terminated in accordance with its terms, exclusive of this paragraph.
(d)Thereafter, the termination date of the foregoing paragraph was extended as follows:

Addendum,

Number Date Extension date

Twelfth._ December 30,1943__ June 30, 1944.
Thirteenth_ June 22, 1944_ June 30, 1945.
Fourteenth_ June 28, 1945_ December 31, 1945.
Fifteenth_ December 29,1945__ June 30, 1946.
Sixteenth_ June 29, 1946_ December 31, 1946.
Seventeenth_ December 30,1946__ June 30, 1947.
Eighteenth_ June 29, 1947_ September 30, 1947.
Nineteenth_ September 30, 1947_ December 31, 1947.
*717 (e) Tlie Sixteenth Addendum (as listed in the preceding subparagraph) amended Article 37 of the contract to read as follows:
Determination of “Net Earnings” or “Net Profit" and “Capital Necessarily Employed in the Business" or “Capital Investment Necessarily Employed in the Operation of the Subsidized Vessels, Services, Routes, and Lines." “Net earnings” or “net profit” and “capital necessarily employed in the business” or “capital investment necessarily employed in the operation of the subsidized vessels, services, routes, and lines” shall be determined for the purposes of this agreement as provided in the applicable rules and regulations adopted and prescribed by General Order No. 81 of the Commission, as amended from time to time.
(f) The termination date was again extended, by action of the Maritime Commission[13] (without incorporation in a formal addendum), to June.30,1949.[14]
(g) On March 21, 1949, the Maritime Commission “* * * authorized an amendment to the Operating-Differential Subsidy Agreement dated October 6, 1938 * * * to be a complete revision of said Agreement and to include, among other provisions * * *, an extension of the term of said Agreement as amended (beyond the interim extension termination of June 30, 1949) to September 30, 1958 (20 years from the effective commencement of operations thereunder) * *
21. On October 5,1951, the parties (APL and the Federal Maritime Board) entered into an “* * * Agreement, made as of January 1, 1947 * * bearing designations “Contract No. FMB-12” and “Extended Operating Differential Subsidy Agreement.” Pertinent provisions of the Agreement follow:
this agreement, made as of January 1, 1947, by and between the united states oe America (herein called the “United States”), represented by the federal maritime board established as an agency within the Department of Commerce by ^Reorganization Plan No. 21 of 1950 *718 (herein called the “Board”), and American president lines, ltd., a corporation organized and existing under the laws of the State of Delaware (herein called the “Operator”).
WITNESSETH :
WHEREAS :
* * * * *
4. With the consent and authorization of the Commission, the Operator, beginning January 1,1947, resumed subsidized operations on the services, routes and_ lines referred to herein subject to the terms and conditions hereinafter set forth;
* * # * #
6. Belying in part on warranties and representations of the Operator the Commission and the Board have made the necessary determinations and findings and the Board has, except with respect to the operation of the combination passenger-cargo vessels in the Trans-Pacific Service (Line A-l), reaffirmed previous determinations and has entered formal orders, all as required by the Act and other applicable law.
now, therefore, in consideration of the premise the parties hereto agree that effective January 1, 1947 (except as otherwise specifically provided herein) the said agreement of October 6, 1938, as heretofore amended and modified, is hereby further amended to read as follows:
PART i
SPECIAL PROVISIONS
1-1. Agreement of Parties. The United States agrees to pay to the Operator an Operating-Differential Subsidy determined as hereinafter set forth, and the Operator hereby agrees during the term of this agreement to operate the vessels hereinafter named on the services hereinafter designated, all in accordance with the terms and conditions in this agreement contained; Provided that the execution of this agreement shall not prejudice the rights, if any, of either the United States or the Operator with respect to (l)'Line A-l, Trans-Pacific Passenger Freight Service (Trade Boute 29-E) and (2) a replacement program with respect thereto on such terms and conditions as the United States shall prescribe;
Hi H* # Hi ❖
1-4. Determination of Amount of Subsidy, (a) Subject to all the terms of this agreement and effective as *719 of January 1, 1947, tbe United States shall, pursuant to Section 603(b) of the Act, pay to the Operator, as operating-differential subsidy, sums not exceeding the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense in which the United States shall find and determine that the Operator is at a substantial disadvantage in competition with vessels of the foreign country hereinafter referred to, in the operation under United States registry of the vessels covered by this agreement, over the estimated fair and reasonable cost of the same items of expense (after deducting therefrom any estimated increase in such items necessitated by features incorporated pursuant to the provisions of Section 501(b) of the Act) if such vessel were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this agreement.
i\i i}i % #
1-11. Recapture Periods. For purposes of Article 11-28 hereof, this agreement shall be deemed to have continued without interruption from October 1, 1938, and the initial period of recapture of excess profits shall expire September 30,1948. The first accounting period of the second recapture period shall end December 31, 1948.
1-12. Termination, Date of Agreement. This agreement shall terminate on December 31, 1957; Provided, however, that the Operator agrees that when the United States determines that combination vessels should be built for operation on the Operator’s Kound-the-World. Service, the Operator shall within 120 days thereafter present and agree in writing to a construction program satisfactory in all important details to the United States, and upon the Operator’s failure to submit or agree to such a program within the allotted time, the United States shall have the right to forthwith terminate this agreement with the Operator.
H* «?•
1-14. Provisions of Part II of this Agreement, (a) This agreement consists of two parts, Part I (designated “Special Provisions”) and Part II (designated “General Provisions”);
* $ * * $
(c) Notwithstanding any provisions to the contrary in this Part I or Part II,
*720 (1) the Operator agrees to accept any changes by the United States in the definition of the term “Capital Necessarily Employed in the Business” as set forth in General Order 71 of the Commission, including, without limitation, changes with respect to the effective date of said definition.
$ ‡ ^ ‡
Part II of this agreement shall be deemed modified to conform herewith.
#
PART n
GENERAL PROVISIONS

% #

11-29. Detemiinaiion of “Net Earnings’’ or 11 Net Profits’'’ and “Capital Necessarily Employed in the Business” or “Capital Investment Necessarily Employed in the Operation of the Subsidized Vessel(s), Service(s), Boute(s), and Line(s)P For the purposes of this agreement:
(a) “net earnings” or “net profit” shall be determined as provided in the applicable rules and regulations adopted and prescribed by the Commission in its General Order No. 31, as amended from time to time;
(b) “capital necessarily employed in the business” and “capital investment necessarily employed in the operation of the subsidized vessel (s), service (s), route (s), and line(s)” shall, with respect to all annual or other accounting periods which terminated concurrently with or prior to the termination of the recapture period which was current on December 31,1946, be determined as provided in the applicable rules and regulations as adopted and prescribed by the Commission in its General Order No. 31, as amended, exclusive, however, of the provisions of General Order 71;
(c) with respect to all annual or other accounting periods terminating subsequent to the annual or other accounting periods mentioned in subparagraph (b) hereof, and in the case of contracts taking effect on or after January 1,1947, the provisions of General Order No. 71, as amended from time to time, defining the terms “capital necessarily employed in the business” and “capital investment necessarily employed in the operation of the subsidized vessel(s), service(s), route(s), and line(s),” shall be controlling, and the provisions of General Order No. 31, as amended from time to time, shall be applicable only to the extent that such provisions are consistent with *721 the provisions of General Order No. 71, as amended from time to time.
22. On September 3, 1952, the Board determined (after hearing) that APL encountered sufficient foreign flag competition in the operation of its transpacific combination passenger-cargo service to qualify for subsidy. On September 25,1952, by Addendum No. 1 to Contract FMB-12, that service v?as included "within the subsidy contract as of January 1, 1947.
C. The Regulations
23. General Order No. 31[15] was adopted by the Maritime Commission on June 11,1940. It provided, in part:
§ 286.2(a) Fundamental dosis. “Capital necessarily employed in the business” or “capital investment necessarily employed in the operation of the subsidized vessels, services, routes, and lines” (such terms being referred to as “capital employed”) shall be determined upon the basis of the net worth reported by the Operator in its balance sheet * * *.
24. General Order No. 71[16] was adopted by the Maritime Commission on December 21, 1949. It provided, in part:
§ 291.5 Definition of capital necessarily employed in the business. Pursuant to section 607(d) of the Merchant Marine Act, 1936, as amended (46 TT.o.C. 1177 (d)), “capital necessarily employed in the business” is defined to be that part of the net worth of a contractor as of the beginning of the accounting period, as defined in paragraph (f) (2) of this section (subject, however, to such interim adjustments as may be provided in this section), properly allocated to and required in the business of operating subsidized vessels and services incident thereto, covered by an effective operating-differential subsidy contract which is represented by and limited to the aggregate of the amounts determined in accordance with the succeeding paragraphs of this section.
(a) Ship equities. * * *
(b) Working capital. * * *
(c) Miscellaneous items. * * *
íjí «Í* «J» sfc »}•
(7) Certain deposits in the Special Reserve Fv/nd. Amounts required to be retained in the special Reserve Fund of the contractor, pursuant to clause 3 of sec *722 tion 607(c) of the Merchant Marine Act, 1936, as amended (46 TJ.S.C. 1177(c) (3)), less deferred recapture liability, if any, shall be included to the extent remaining on deposit from and after the end of the recapture period last preceding, or current on the day preceding, the effective date of this section, and at the end of each subsequent recapture period computed, however, on the basis of 5% of capital necessarily employed as determined under all the other provisions of this section.
* * H=
(8) Certain deposits in the Capital Reserve Fwnd. If the contractor shall have entered into a contract for the purchase or the improvement (including betterment) of a vessel required to be operated in the subsidized routes, lines, or services, under the provisions of the contractor’s operating-differential subsidy contract, or shall have been directed by Maritime Commission action to make or reserve deposits in its Capital Keserve Fund, in excess of funded depreciation as determined pursuant to paragraph (a) (4) of this section, for the purpose of entering into a construction program as provided for in title V of the Merchant Marine Act, 1936, as amended (46 U.S.C., Ch. 27, Subch. V), the amounts required to make or complete the down payment on the purchase price of the vessel or vessels or the improvements, or the required deposits (but not in excess of 25% of the purchase price of the vessel or vessels unless otherwise determined by the Maritime Commission or 100% of the cost of the improvements, or 100% of the required deposits) shall be included as and from the effective date of the contract for the purchase or improvement of the vessel or vessels, or of the required deposit to the extent of amounts then on deposit in the Capital Keserve Fund other than those representing “limited funded depreciation”: Provided, however, That the Maritime Commission reserves the right to require, as a condition to the granting of such allowance, that the contractor, concurrently with the execution of the purchase or improvements contract or within ninety days from the publication date of this section, whichever date shall last occur, shall establish a construction fund under an agreement satisfactory to the Commission, or make the required deposits.
* * * * *
(f) Description of terms. * * *
(3) The term “recapture period,” as used in this section, shall have the meaning of “any ten year period,” or applicable portion thereof, with respect to which recapture of excessive profits is required pursuant to sec *723 tion 606(5) of the Merchant Marine Act, 1936, as amended (46 IT.S.C. 1176(5)), as said section is construed by the Maritime Commission.
(g) Effective date. The effective date of this section shall be the day next following the termination of the recapture period which was current on December 31,1946, with respect to an operating differential subsidy contract then effective. With respect to an operating differential subsidy contract made after December 31, 1946, the effective date of this section shall be the date specified in the contract as the effective date thereof.
25. Amendment No. 1 to General Order No. 71[17] was adopted by the Federal Maritime Board on September 17, 1952. It provided:
General Order 71 (§ 291.5 Definition of capital necessarily employed in the business), published in the Federal Register, issue of December 31,1949 (14 F.R. 7936, 46 CFR 291.5), be and the same hereby is amended as follows:
1. By striking the period at the end of subparagraph (8), Certain deposits in the Capital Reserve Fund of paragraph (c) Miscellaneous items and adding the following:
“And provided further, That for the period between December 31, 1946, and the termination of the recapture period which was current on December 31, 1946, only, there shall be included in ‘capital necessarily employed in the business’ amounts (excluding mortgage payments) actually disbursed from the Capital Reserve Fund, or from other funds to the extent that the Administrator determines that such disbursements from other funds would have been payable or reimbursable from the Capital Reserve Fund upon proper application, between January 1, 1947, and December 31, 1949, for the purchase or reconstruction (including capital-izable expenditures for reconditioning, betterment, and improvement) of a vessel or vessels required to be operated in the subsidized services, routes, or lines under the provisions of the respective operating-differential subsidy agreements and all agenda thereto, to the extent that such amounts are not otherwise so includible under the provisions of this section; And provided further, That in no event shall there be so included any funds, prior to the date of the availability thereof for such use.
*724 2. By striking paragraph (g) Effective date in its entirety and substituting therefor the following:
(g) Effective Date. The effective date of this section, as amended, shall be as follows:
(1) The day next following the termination of the recapture period which was current on December 31, 1946, with respect to an operating-differential subsidy resumption addendum executed prior to May 1, 1951;
(2) January 1, 1947, with respect to an operating-differential subsidy resumption addendum executed after April 30,1951; and
(3) The effective date of the contract, with respect to an operating-differential subsidy contract executed after December 31,1946 (Sec. 607, 49 Stat. 2005, as amended; 46 Ü.S.C. 1177).
IV. NARRATIVE
A. 1937 through 1945
26. (a) During the years 1937 and 1938, Maritime entered into operating differential subsidy contracts with 12 American flag operators.[18] The agreement with plaintiff was signed on October 6, 1938.
(b) For purposes related to the recapture of excess profits, as required by the statute, each of the 12 contracts defined “capital necessarily employed” in terms of net worth, a concept representing basically the difference between assets and liabilities.
(c) While the several operators then had capital (net worth) sufficient to the needs of their subsidized operations, none possessed capital in an amount disproportionate to such needs.
(d) On June 11, 1940, Maritime issued its General Order 31,[19] wherein it adopted “the net worth reported by the Operator in its balance sheet * * *” as the basis for determining “capital necessarily employed.”
27. (a) World War II began on September 1, 1939, with the German invasion of Poland. The phase known as the “phony war” followed the dismemberment of Poland by Ger *725 many and Russia. The “phony war” ended with the German conquest of Norway in April and the invasion of the Low Countries in May 1940. The fall of France occurred a month later.
(b) From September 1939 through the early months of 1940, the effect of the European war upon American shipping was spotty. Following the fall of France, pronounced increases in the volume of business occurred for all American lines, because of the preoccupation of European shipping with the war and the consequent withdrawal of substantial portions of foreign flag competition. American shipping, including the subsidized lines, began to show increasingly large profits.
(c) Increases in profits were soon reflected in increases in net worth. The increases in net worth decreased Maritime’s prospects of recapture of excess profits, since recapture was geared to the excess of 10 percent of net worth.
(d) In 1941, Maritime’s Director of Finance recommended modification of General Order 31 in such manner as to recognize the pyramiding of earnings and to adjust the definition of capital necessarily employed accordingly. The Maritime Commission agreed in principle that General Order 31 should be modified, but took no action to make such a modification effective.
28. (a) Japanese forces attacked Pearl Harbor on December 7, 1941. A few months later (early in 1942), a general requisition of merchant vessels occurred, to make them available for prosecution of the war effort in operations by the War Shipping Administration through General Agents.
(b) The general requisition brought to an end the operation of subsidized services and the payment of subsidies.
(c) Instead of terminating the operating differential subsidy contracts, Maritime extended their termination dates, conditionally, in the interest of resumption of the services after the war.[20]
29. (a) At the end of hostilities in August 1945, it was apparent that the orderly resumption of subsidized operations entailed large and tedious tasks for both Maritime and *726 the operators. Many of the original vessels had been lost in the war. Beplacements had to be purchased or built, involving the development of new standards. Changes in routes and sailing frequencies were inherent in changes in world markets and the yet-to-be evolved pattern of foreign flag competition.
(b) The need for new and different financial controls by Maritime had been accentuated by the war. The operators were abnormally long on cash and short on ships. Their cash positions had been made topheavy by the increased earnings of 1940-1941 and by insurance payments for ships lost in war action.
(c) All concerned recognized the necessity for detailed revisions of the prewar contracts and the demands on time and effort to be made by such revisions. Agreement had to be reached by Maritime with each line individually as to vessels, replacement obligations, routes, and sailings. Standards had to be evolved and agreed upon for the establishment of expanded financial controls. Determinations had to be made of the costs of foreign flag operations on each subsidized route as the basis for determination of subsidy rates.
B. 1946 through 1949
3,0. (a) On April 30,1946, Maritime prescribed a form of application by the operators for permission to resume subsidized operations. The holders of operating differential subsidy agreements were advised that:
* * * voyages commenced under approved sailing schedules * * * will be eligible for subsidy payments, provided the Commission * * * approved the application and makes all determinations necessary under the * * * Act * * * and provided all conditions imposed by the Commission in connection with its approval of the application and all provisions authorized to be incorporated in an addendum to the current * * * agreement have been * * * agreed to by the applicant in writing.
(b) On May 2, 1946, plaintiff resumed the commercial (not subsidized) operation of merchant vessels.
(c) On June 29,1946, plaintiff and Maritime executed the Sixteenth Addendum to their operating differential subsidy contract, extending the termination date to December 31, *727 1946, and amending the contract to provide for the determination of capital necessarily employed in conformity with the provisions of General Order 31 “as amended from time to time.”
(d) On July 12, 1946, plaintiff applied to Maritime for permission to resume subsidized operations as of May 2,1946.
(e) On November 20, 1946, Maritime forwarded “to all subsidized operators * * * a draft of a proposed Supplement No. 2 of General Order No. 31 which has been prepared as the result of a study of the exceedingly large operating profits and capital gains realized by subsidized operators during the period following the commencement of the conflict in Europe upon the operation of the reserve and ‘recapture’ provisions of the * * * Act * * * and of operating differential subsidy agreements * * *.” The draft contained a “proposed revision of the provisions of General Order No. 31 relating to the determination of ‘capital necessarily employed * * The draft had been tentatively approved by Maritime, and was forwarded to the operators “for comment and discussion.”
(f) On December 10, 1946, Maritime requested the operators to resume subsidized operations on January 1, 1947, pursuant to terms outlined in earlier communications.[21] These terms included requirements for surveys, inventories, accounting, and advance submission and approval of sailing schedules. The operators agreed.[22] Operations of subsidized services were resumed, on the conditional basis outlined by Maritime, on January 1,1947.
31. In submitting the proposed Supplement 2 to General Order 31 to the operators in November 1946, Maritime hoped and intended to arrive at a satisfactory definition of capital necessarily employed for application to all subsidized operations from the date of resumption. Agreement with the operators proved elusive, and Maritime continued irresolute *728 about the matter because of its complexities.[23] Negotiations continued for 2 years. When the time came for decision, Maritime disapproved the Supplement 2 definition[24] and directed the preparation of a new definition. This action was taken on November 30,1948.
32. (a) Meanwhile, throughout the years 1947, 1948, and 1949, correspondence passed between Maritime and plaintiff directed toward agreement upon other provisions to be inserted in a resumption addendum. At the outset, plaintiff asserted its need for “definitive answers as to the subsidization of the voyages it is now conducting under the subsidy agreement.”[25] Maritime replied that, its “authorizations contemplate that, subject to * * * the making of the necessary findings and determinations by the Commission * * *, voyages of qualified vessels beginning on and after January 1,1947, will receive subsidy at rates based on the differential between your subsidizable expenses and the estimated foreign costs.”[26] Subsequent negotiations were rested on this understanding.[27]
(b) On December 7,1947, Maritime chartered to plaintiff the passenger-cargo vessels tresident Cleveland and tresi- *729 dent wilson f or operation in the subsidized transpacific service. The charters were extended on June 27, 1949.
(c) On July 9, 1948, Maritime advised plaintiff of its requirement for construction of new combination passenger-cargo vessels for use in the round-the-world service of the subsidy contract. On August 18,1948, plaintiff agreed to the bid of the New York Shipbuilding Corporation for the construction of three such vessels for a total price of some $22 million.[28]
(d) On April 1, 1949, Maritime authorized plaintiff to postpone the deposits for depreciation in the statutory reserve funds for 1947 and 1948 until subsidy for those years had been received.
(e) On May 10,1949, Maritime advised plaintiff that computations of APL subsidy rates were proceeding, but that delay had been encountered because of the complexity of research into foreign costs, and requested plaintiff’s assistance in gathering foreign cost data.
33. (a) On May 13,1949, Maritime forwarded to plaintiff a detailed (13-page) letter listing the determinations made by Maritime for incorporation in plaintiff’s resumption addendum.[29] The letter contained the following:
* * * to facilitate preparation of an appropriate addendum to your Operating-differential Subsidy Agreement, it is requested that you indicate your concurrence by endorsement and return of the attached copy of this letter.
Space was provided on the letter for the endorsement, if made. Plaintiff did not make the endorsement.
(b) On July 1, 1949, plaintiff replied to Maritime’s statement by a separate letter calling attention to “certain minor needed refinements” (which dealt with route descriptions and annual sailings) and concluding: “Subject to the above, we concur in the action of the Commission.”
(c) On July 14, 1949, Maritime, writing to plaintiff, acknowledged receipt “of your letter of July 1, 1949, con *730 curring in substance, in the action taken by the Commission.” Maritime’s letter further—
* * * noted that, acting upon the invitation contained in said letter of May 13, you have offered certain suggestions * * *. These matters will be studied by the staff and a supplemental report made to the Commission prior to the actual drafting of Part I of the Eevised Agreements.[30]
(d) The resumption addendum of October 5, 1951, was drafted by Maritime on the basis of a staff memorandum of March 16,1951, which recited: “This letter of May 13th was accepted by a letter from APL, dated July 1,1949, with certain reservations, copy attached.”
34. (a) On August 24, 1949, the draft of a new definition of capital necessarily employed was submitted to the industry by Maritime,[31] and was made the subject of an informal hearing on October 17,1949. This proposal, instead of specifying an effective date, left the matter open for later insertion.
(b) The proposed definition provided for inclusion in capital necessarily employed of assets representing ship equities, net working capital equal to voyage expenses, net equity in other physical assets employed in subsidized services, funded depreciation on subsidized vessels, and an amount equal to the required 25 percent down payment on new subsidized vessels under executed purchase agreement. Excluded (by omission) were capital reserve funds awaiting expenditure for new or replacement vessels or obligated under ship mortgages.
(c) Maritime’s staff suggested that the new (1949) proposal should be made applicable as of January 1, 1947, the date when subsidized operations were resumed. The industry objected, contending that the proposed definition failed to take into account the abnormal situation existing at the time of resumption, when the operators held cash balances in excess of their normal requirements but which were, within the next year or two, converted into ships for the *731 subsidized services. The industry urged: (1) that the effective date of the proposal should be fixed at January 1, 1950; and (2) if the definition were made retroactive', it should be so modified as to include funds actually used for vessel acquisition during 1947,1948, and 1949.
(d) Maritime adopted the proposal on December 21,1949, as its General Order 71. Effective dates were so stated as to make the regulation applicable to each operator upon “the termination of the recapture period which was current on December 31, 1946.”[32] The recapture periods expired at varying dates, from December 31, 1947, to December 31, 1950.[33]
C. 1950 through 1952
35. (a) Maritime’s action in defining capital necessarily employed (through the issuance of its General Order 71) removed the last of the obstacles of general application to the execution of formal resumption addenda to the operating differential subsidy contracts. Contracts with five of the operators were executed within 2 weeks.
(b) Each of the contracts (as finally signed with all 12 operators) contained the provision, in 11-29, that capital necessarily employed would be determined in accordance with General Order 31, as amended, with respect to the recapture period current on December 31,1946, and thereafter in accordance with General Order 71.
36. (a) On February 6, 1950, there was published[34] the Comptroller General’s report[35] on his audit of the Maritime *732 Commission for the fiscal years ended June 30, 1948 and 1949.
(b) Following are representative excerpts from the report:
* * * The net worth of twelve subsidized lines increased from $65,000,000 on December 31, 1937, to over $363,-000,000 on December 31,1948 — an increase of about 460 percent. During that same period these twelve operators realized net profits after Federal income taxes of $371,-000,000. And the Federal income taxes which were paid by these operators averaged only 21 percent of their net profits before taxes, as compared to much higher rates assessed corporations in other lines of business.
* * * the Commission has estimated that the amount [of operating differential subsidy payments] accrued for the period from January 1, 1947, to June 30, 1949, is $76,112,958 and that the amount recapturable as a result of operations in that period is $41,034,658. * * *
One of the most important determinations which the Commission must make * * * is the definition of the contractor’s “capital * * * necessarily employed * * The Commission’s original definition, as stated in its General Order 31, is roughly equivalent to net worth * * *.
* * * since the tremendous increases in the statutory reserve funds which have resulted from the abnormal profits under present conditions could not have been foreseen when the definition of capital employed was originally adopted, it seems not unreasonable to now reexamine the subject in the light of present circumstances. * * *
* * * On the basis of the average capital necessarily employed in 1937, * * * the operator could earn $18,481 per vessel per year after deduction of Federal income taxes before being required to repay any of the operating subsidy. However, by 1948 the amount the operator would be entitled to retain had increased to $133,707 per vessel per year after * * * taxes.
* * * capital necessarily employed has increased more than $200,000,000 since 1941 * * *. Although the Commission has considered the problem at various intervals during the past eight years, the definition had not been changed at the date of this report (November 15, 1949).
*733 At this point there followed a footnote alluding to the Commission’s action of December 21,1949, adopting a revised definition, and noting that—
The new definition * * * is to be effective at varying dates between 1947 and 1950 * * *. The Commission had previously decided, and had notified the operators, that the new definition would be effective on January 1, 1947. The Commission’s reversal on this point will decrease the amount of subsidy subject to recapture * * *.
(c) The Comptroller General’s report closed with a recommendation that—
The Commission take such action as may now be available to prevent the payment of the excess subsidies * * * discussed in this report.
37. (a) On February 9, 1950 (being the Thursday following the Monday on which the Comptroller General’s audit report was published), hearings were begun by the Government Operations Subcommittee of the Committee on Expenditures in the Executive Departments of the House of Representatives.[36] Members and staff of the Maritime Commission testified before the Subcommittee on February 9, 13, 14, and 20, and on March 6, 7, 8, 25, and 27, 1950.
(b) Among other matters developed in such testimony was a difference of opinion in Maritime (among members and among staff) as to the warrant for and the advisability of making the new definition of capital necessarily employed effective on January 1, 1947, rather than at the end of the several recapture periods.
(c) There was testimony before the subcommittee to the effect that the subsidized operators were fully apprised of the continuing intent of the Maritime Commission to make the new definition of capital necessarily employed, whenever adopted, effective as of the resumption of subsidized operations ; and that the operators, although none too happy over the prospect, fully expected such an eventuality.[37]
*734 38. (a) On February 11, 1950, Maritime forwarded to Moore-McCormack Lines, Inc., a detailed (11-page) letter, similar to the letter to plaintiff described in finding 33 (a), outlining Maritime’s action on all of the terms to be included in a resumption addendum (including the availability of General Order 31, as amended, for the duration of its existing recapture period) and concluding with a request for “* * * your concurrence * * * by signing and returning promptly the enclosed copy of this letter.”
(b) On February 27, 1950, Moore-McCormack Lines returned the copy endorsed as follows:
We concur in the foregoing. However, we are writing under separate cover requesting a redescription of the several trade routes in the interest of clarity and brevity; and, commencing with 1950, that on Trade Eoute 1 the minimum sailings be reduced from 84 to 70; on Trade Eoute 6 that the sailings be from 24 to 60 instead of 48 to 52; and on Trade Eoute 34 that the maximum be increased from 18 to 20. Certain minor errors in the description of the vessel can be corrected in drawing the Contract.
(c) More than a year later, on March 8,1951, the resumption addendum was signed. It did not contain Article I-14-c.
39. (a) On May 18, 1950, the Government Operations Subcommittee of the Committee on Expenditures in the Executive Departments issued its Sixth Intermediate Ee-port,[38] captioned “Further Inquiry into the Operations of the Maritime Commission.”
(b) In its report the subcommittee concluded and recommended as follows:
* * * Your subcommittee believes the Commission unnecessarily delayed revising the definition, and, further, we believe the effective date of the revised definition as determined by the Commission creates inequities rand unjustifiably increases the financial burden on the Government. * * *
* * * Eecommendations. * * * 2. That the effective date of the revised definition of “capital necessarily employed” be again reviewed in the light of the hearings.
*735 40. (a) On May 24, 1950, Reorganization Plan No. 21 of 1950 [39] abolished the Maritime Commission and in its stead created the Federal Maritime Board and established within the Department of Commerce the Maritime Administration.
(b) The newly created Board, pursuant to the Congressional recommendation, promptly ordered a review of General Order 71.
41. (a) When Maritime staff reopened discussions of General Order 71 with the operators, seven of them had signed resumption addenda. These operators insisted upon their contractual rights under Article 11-29 (prescribing General Order 31 application to the end of their several recapture periods) and refused to agree to a rollback of General Order 71 to January 1, 1947. They adhered to this refusal in rejecting a Maritime proposal to amend the definition of capital necessarily employed to include amounts actually disbursed from the capital reserve funds between January 1, 1947, and December 31, 1949, for the acquisition or improvement of vessels for subsidized operations.
(b) With the impasse thus renewed, there followed further study by Maritime, and extensive discussions and negotiations with the operators.
(c) On December 24,1950, Maritime advised the Government Operations Subcommittee:
In carrying out the Committee’s recommendation to review the effective date of General Order No. 71, serious legal and policy problems have been encountered. The suggestion has been made that no considerable staff work would be required to make the General Order No. 71 definition retroactively applicable to all of the subsidized operators as of January 1, 1947. However, our review has demonstrated that the soundness of a retroactive amendment of the effective date of the definition cannot be determined without also considering the soundness of the definition itself. Analysis of the problems involved has required the assembly of financial and other data with respect to the impact on the merchant marine of such a “roll-back.” In this connection information has been compiled and is now under active study with respect to the use by the operators of funds on hand in their statutory reserve funds as of January 1, 1947, for the *736 purchase and acquisition of ships and other capital assets for use on essential trade routes. The matter is further complicated by the fact that eight of the subsidized operators, seven by formal Extended Operating-Differential subsidy agreements and one by exchange of correspondence, entered into firm contracts with the former Maritime Commission providing that the General Order No. 71 definition should not be applicable to their recapture periods current on December 31,1946.
Extensive staff work in which a representative of the General Accounting Office has participated as an observer must precede any informed decision by the Board on these problems. This work is nearing completion after which a prompt decision can be made by the new Federal Maritime Board. Two informal meetings with representatives of the industry have been held. Prior to the presentation to the Board of the staff’s final recommendations on the whole problem of the proper definition of “capital necessarily employed in the business,” including the effective date of such a definition, a further hearing will be accorded to the operators, some of whom are vitally affected by the decision on this matter.
42. Meanwhile, on September 6,1950, plaintiff’s president wrote to Maritime:
In the five year period which followed those first discussions we have fulfilled, we think completely, the obligations which rested upon us as subsidized operators. We have filed elaborate and expensive reports. We have maintained services on our routes with ships, sailing frequencies, itineraries and fixed schedules conforming to Commission requirements. We have maintained capital and special reserve funds. We have purchased eleven new vessels sailing on subsidized routes, have contracted to purchase three more now under construction and have filed an application to build another four vessels. We have thus committed more than $50,000,000.00 to carry out a vessel replacement program. We have met and conformed to all obligations imposed upon subsidized operators relating to employment of American labor, use of American supplies and materials, and limitations upon salaries. We have discharged numerous other obligations of a subsidized operator, many of them onerous.
During the five year period we have spent thousands of man-days on the development of material for the revised agreement, and many months of negotiations in Washington. We have filed hundreds of pages of data disclosing the operating costs of our foreign-flag com *737 petitors. We have supplied, every such information the need or desire for which is known to us.
In these circumstances we are advised that the Administration has no proposed subsidy rates yet developed for inclusion in our agreement, either tentative or permanent. We have been unable to ascertain a date by which the Administration will be prepared to enter into a postwar revision of the agreement. The former Maritime Commission said early this year, “There is a reasonable expectation that the * * * extension addendum can be executed during the current calendar year with the establishment of subsidy rate.” No draft of such revision has been made so far as we are informed. We are unable to collect operating-differential subsidy which aggregates net after recapture more than $13,000,000.00 at the minimum rates which we estimate will be applicable and the value of which at a low rate of interest is more than $35,000.00 a month.
In the absence of the earned operating-differential subsidy, we cannot proceed further with vessel replacement. We are handicapped in the consideration of common stock dividends, none of which are being paid. Investors are selling common stock in the company at a price equal to two-fifths the actual investment in the company’s ships and working assets applicable to common stock.
Excluding subsidy receivable, we had a net current deficit of more than $3,000,000.00 at December 31, 1949, despite the absence of common stock dividend payments. We are increasingly handicapped in conducting the kind of steamship planning and operation which could be expected of us if our operating-differentials had been determined and we were being paid.
43. On March 8, 1951, as heretofore noted,[40] the resumption addendum of Moore-McCormack Lines was signed. This addendum, “in accordance with prior agreement,” excluded application of the General Order 71 definition to the recapture period current on December 31, 1946. Maritime subsequently gave the following explanation of its action:
* * * Moore-McCormack * * *, by letter of February 10, 1950, was advised of the Commission’s action with respect to its resumption of subsidized operation. This letter provided for inclusion in the resumption agreement of Article 11-29 which excludes application of the General Order 71 definition until the termination of the *738 recapture period which was current on December 31, 1946. Moore-McCormack formally accepted the Commission’s offer * * * by endorsing its acceptance thereon under date of February 27,1950.
This written offer and acceptance * * * constituted an informal but none the less binding contract by the Commission to give, and by Moore-McCormack to accept i* * * Article 11-29. Moore-McCormack, therefore, stood on the same legal footing as the other seven “contracting lines.” * * *
44. On March 22,1951, there was published [41] a letter from the Comptroller General concerning his further audit of Maritime. Excerpts follow:
The Commission had notified the operators that a new definition would be effective January 1, 1947, when subsidized operations were resumed after the war, but when the new definition was adopted in December 1949 the Commission decided to make it effective upon the expiration of each operator’s current subsidy recapture periods. These periods expired at various dates between 1947 and 1950. If the decision as to the effective date of the new definition is allowed to stand it will give a number of the operators the benefit of the higher additional periods ranging from one to four years. This will cost the Government about 2% million dollars.
The Commission’s 8-year delay in revising the definition and its action in changing the effective date was one of the many matters investigated by the Government Operations Subcommittee of the House Committee on Expenditures in the Executive Departments. The subcommittee’s conclusion follows.
Your subcommittee believes the Commission unnecessarily delayed revising the definition, and, further, we believe the effective date of the revised definition as determined by the Commission creates inequities and unjustifiably increases the financial burden of the Government.
The Committee recommended that the effective date of the revised definition be again reviewed in the light of the hearings.
On December 14, 1950, the Chairman of the Federal Maritime Board notified the chairman of the Government Operations Subcommittee that the soundness of the definition, as well as a retroactive change in the effective date, was being studied, that data was being assembled *739 with respect to the impact on the merchant marine of such a “roll-back,” that meetings had been held with representatives of the industry, and that further meetings would be held. These meetings have now been held. Although the staff had done considerable work on this matter, it had not submitted a recommendation to the Board by February 15,1951.
45. (a) On April 3, 1951, Maritime approved a staff recommendation[42] of authorization for plaintiff’s formal resumption addendum. Among the conditions listed by the staff (as its Recommendation 4(a)) was the following:
Substitution of Standard Part II * * * except that irrespective of Article 11-29 * * * the Board by provision to be incorporated in Part I to reserve the right to modify General Order 71 both as to the substance and effective date thereof.
(b) Maritime’s decision specified that:
It appearing from the evidence * * * that Recommendation 4(a) of said staff memorandum that the Board shall reserve the right to modify General Order 71 both as to substance and effective date thereof notwithstanding Article 11-29 of Standard Part II * * * is in the public interest and should be approved; * * *.
(c) The draft ultimately approved for inclusion in the resumption addendum to carry out the reservation relating to the effective date of General Order 71 became Article I 14 — c, reading as follows:
* * * (c) Notwithstanding any provisions to the contrary in this Part I or Part II,
(1) The Operator agrees to accept any changes by the United States in the definition of the term “Capital Necessarily Employed * * *” as set forth in General Order 71 * * *, including, without limitation, changes with respect to the effective date of said definition; * * *.
(d) Plaintiff first learned of the proposed amendment shortly after the action by Maritime.
46. (a) On April 25,1951, Maritime staff held an informal meeting with representatives of the 12 subsidized operators[43] *740 on the staff proposal to make General Order 71 effective as of January 1,1947, for the 4 operators[44] who had not signed formal resumption addenda.
(b) All present understood the purpose of the staff proposal to be the writing into the resumption addenda, which were yet to be executed, provision for the rollback of General Order 71 to January 1, 1947, if Maritime should so decree. Spokesmen for the industry questioned the legality, as well as the equity, of such a rollback, as being arbitrarily discriminatory, and challenged the validity of a contractual provision whereby the operator might undertake to acquiesce in such an application of the regulation.
(c) Maritime’s General Counsel indicated his reliance upon acceptance by the operator of a contractual provision authorizing the rollback as representing the basis of legally valid action, saying he was assuming acceptance by the operators “only under some bargaining pressure.”
(d) On June 1, 1951, the staff recommended that General Order 71 be amended to provide that its effective date be retained as the end of the recapture period current on December 31,1946, for the operators who had executed resumption addenda prior to May 1, 1951, and that the effective date be January 1,1947, for those who executed such addenda thereafter. The staff further recommended amendment of General Order 71 to provide that, where the effective date was January 1, 1947, capital necessarily employed could be increased by the amounts actually spent for ship purchase or reconstruction on or before December 31,1949.[45]
47. (a) On June 6, 1951, a resumption addendum was signed by American Export Lines, one of the four operators for whom the rollback was under consideration. In this instance, however, the resumption addendum was made effective on January 1,1948, instead of January 1, 1947. Ameri *741 can Export Lines thus waived subsidy payments for the year 1947.[46]
(b) On August 16, 1951, another of the four operators to whom the rollback might have been applied (New York and Cuba Mail Line) signed a similar contract with similar effect.[47]
48. (a) On July 11, 1951, the staff recommendation described in finding 45 came on for oral argument before Maritime.
(b) The industry repeated its argument that the proposed amendment was invalid because retroactive and discriminatory, and that its defects could not be cured by contractual acquiescence. Maritime’s General Counsel defended the staff proposal.
(c) Maritime took the matter under advisement.[48]
49. (a) On July 16, 1951, Maritime’s staff completed the draft of a resumption addendum for plaintiff. This draft contained the rollback authorization provision, I-14Lc.
(b) On July 20, 1951, plaintiff’s president wrote to Maritime:
* * * Article 1-14 * * * contains the previous language about General Order No. 71, including the “roll-back” costing $700,000. We consider unfair the suggestion that American President Lines individually, or as one of a group of two or three out of eleven or twelve operators, be required to accept this additional burden.
(c) On September 18, 1951, Maritime forwarded copies of the resumption addendum to plaintiff for execution. The forwarding letter said:
* * * Prior to the preparation of the agreement in the form herewith submitted, the * * * Board was advised of the contents of your letter of July 20,1951 * * *. As of this date, the * * * Board has not rendered a decision concerning General Order 71 * * *.
*742 (d) At this time plaintiff knew that the issue as to the effective date of General Order 71 was pending decision by Maritime. It knew that one possible outcome of that decision might be the retroactive application of General Order 71 to those operators who signed a contract containing Article I-14-c. Plaintiff hoped, however, that Maritime would consider the objections of the industry and forego such retroactive application.
50. (a) On September 28, 1951, a resumption addendum was signed by Oceanic Steamship Company. This addendum contained the rollback authorization clause, I-14-c.[40]
(b) On October 5,1951, plaintiff’s resumption addendum was signed, becoming Contract FMB-12, the pertinent provisions of which are set forth in finding 21.
(c) Plaintiff signed Contract FMB-12 in full realization of the possible use by Maritime of Article X-14-c to roll back the effective date of General Order 71 to January 1,1947.
(d) From January 1,1947, to October 5,1951 (the date of Contract FMB-12), plaintiff adhered to all of Maritime’s requirements of a subsidized operator. Its operations had been conducted pursuant to understanding, on the part of plaintiff and Maritime, that plaintiff was a subsidized operator.[50]
51. (a) Among the causes for the delay in the execution of plaintiff’s resumption addendum were the following:
(1) Computation of the applicable subsidy rates, to equalize the specified costs of plaintiff’s foreign flag competition, was difficult and prolonged.
(2) The right of plaintiff to carry intercoastal passengers and cargo on its round-the-world service was challenged by other lines. The question was resolved, after public hearing, on June 13, 1951.
(3) There were doubts that there was sufficient foreign flag competition to warrant subsidy payments on the transpacific combination passenger-cargo vessels. This service was *743 omitted from the original Contract FMB-12 in order to avoid further delay in the execution of the resumption addendum.[51]
(4) Differences of opinion within the Government as to the proper construction-differential subsidy rate for the construction of three combination vessels and on improvements to three freighter vessels delayed Maritime’s consideration of the resumption addendum to the operating differential subsidy contract. The three vessels under construction were taken over by the Navy in September 1950, for defense purposes. Further delay ensued in reaching agreement on a revised replacement program.[52]
(b) Maritime’s prolonged consideration of the definition of capital necessarily employed or of the effective date of General Order 71 was not a specific cause of delay in the execution of plaintiff’s resumption addendum, beyond the delay inherent therein applicable to all other subsidized operators.
52. (a) On September 17, 1952, Maritime issued Amendment 1 to General Order 71, wherein (1) the original General Order 71 definition of capital necessarily employed was modified to permit the inclusion of funds actually disbursed for the purchase or reconstruction of vessels during the period from December 31, 1946, to the end of the recapture periods then current; and (2) the effective date of General Order 71 was rolled back, as to those operators whose resumption addenda were executed after April 30,1951, to January 1,1947.
(b) In issuing the amendment, Maritime appended a detailed explanation of its action. Pertinent excerpts follow:
* * * A retroactive application unilaterally by the Board of the General Order 71 definition to the contracting operators in violation of Article 11-29 of their resumption addenda would constitute not only a breach of contract by the Government, but also action in violation of the express Congressional intent that holders of operating subsidy contracts should thereby obtain “a fair measure of stability” in the governmental policy as embodied in such contracts. * * *
*744 Accordingly, we find that we are not free to impose either the original or an amended General Order 71 definition upon the contracting lines prior to the end of their recapture periods which were current on December 31,1946.
As to the four other non-contracting operators, we are free to exercise policy judgment untrammeled by contractual commitments. Under the authority conferred by section 607 (d) there is both the power and the duty to amend the definition of “Capital Necessarily Employed” to whatever extent may be necessary to promote the policies and purposes of the Act.
We are conscious of the desirability of equal treatment of both contracting and non-contracting operators. That we are barred by contractual obligations from applying uniformly a definition which we believe to be sound does not justify, in our opinion, the granting to the non-contracting operators a definition which we would not have favored were we in the original proceeding. Considerations favoring a sound rule outweigh the considerations of uniformity when uniformity carries with it the extension of a rule which, in our opinion, does not represent a reasonable solution of the problems faced in 1946.
(c) Plaintiff filed with Maritime a timely petition for reconsideration of the decision. The petition was denied on December 18,1952, without opinion.
(d) Plaintiff has since reserved its rights, with the concurrence of Maritime, to assert the position now taken with respect to the application of General Order 81 to the recapture period ending on September 30, 1948.
v. conclusions
A. Maritime
53. (a) At the time of the rollback decision and action (September 17, 1952), Maritime knew (1) that the eight operators who signed resumption addenda before May 1, 1951, occupied a more favorable position by reason of the application of General Order 31 to their recapture periods current on December 31,1946, than did other operators; (2) that two of the operators (American Export Lines and New York and Cuba Mail Line), whose resumption addenda were signed after April 30, 1951, but before September 17, 1952, had waived subsidy payments for the year 1947; and (3) that *745 only two operators (plaintiff and Oceanic) remained as “non-contracting” lines, to be affected by the rollback.
(b) The members who comprised the Federal Maritime Board in September 1952 announced the rollback action as being in conformity with the course which they then thought they would have followed in 1946 if they had then been in position to make the decision.[53] The good faith of Maritime is not in issue.
(c) The rollback action was predicated on contractual rights specified in the resumption addenda of plaintiff and Oceanic.[54] There was no suggestion in the Maritime opinion of any other factual difference between plaintiff and Oceanic on the one hand, and the eight other operators on the other.[55]
(d) The cutoff date of May 1, 1951, in Amendment 1 to General Order 71, was established in discussions which followed the publication on March 22,1951, of the Comptroller General’s further audit of Maritime (finding 44) .[56] The selection of the date represented a practical differentiation between operators who had and those who had not signed resumption addenda.
B. Moore-McCormack
54. (a) Of the eight operators who had signed resumption addenda before May 1,1951, agreements had been completed with seven of them a year earlier, May 1, 1950. The eighth operator to sign was Moore-McCormack, on March 8,1951.[57] *746 Maritime later explained its action with, respect to Moore-McCormack on the ground that the operator’s endorsement of the Commission’s memorandum constituted “* * * an informal but none the less binding contract * * * to give, and * * * to accept * * * Article 11-29.”[58]
(b) Maritime’s memorandum to Moore-McCormack was dated February 10, 1950. Nearly a year earlier, on May 13, 1949, a similar memorandum had been sent to plaintiff. Instead of endorsing the memorandum, plaintiff replied by separate letter calling attention to “certain minor needed refinements” (dealing with route descriptions and annual sailings) and saying that “subject to the above, we concur * * Maritime acknowledged the letter as “concurring in substance.”[59]
(c) Moore-McCormack qualified its endorsement by calling attention to certain needed minor refinements relating to route descriptions and sailing schedules. Plaintiff concurred in Maritime’s action by separate letter. The difference between the two situations is technical.
(d) It is not established by the evidence that plaintiff raised with Maritime or that Maritime considered the question of plaintiff’s right to be accorded the same treatment as Moore-McCormack.
C. Plaintiff
55. (a) When plaintiff entered into Contract FMB-12, it understood fully the purpose and potential of Article I-14-c.
(b) With respect to the rollback of General Order 71, plaintiff feared the worst while hoping for the best. Except for such hope, there is no indication in the evidence that the parties had in contemplation some use of Article I-14-c which would entail changes other than those ultimately made.
VI. APPENDIX
56. Pertinent provisions of the Merchant Marine Act of 1936 follow:
Section 101. It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine
*747 (a)sufficient to carry its domestic waterborne commerce and a substantial portion of the water-borne export and import foreign commerce of tbe United States and to provide shipping service on all routes essential for maintaining the flow of such domestic and foreign waterborne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States insofar as may be practicable, and (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel. It is hereby declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.
Sec. 201. (a) An agency is hereby created to be known as the United States Maritime Commission (hereinafter referred to as the Commission).
* * * * *
Sec. 211. The Commission is authorized and directed to investigate, determine, and keep current records of—
(a) The ocean services, routes, and lines from ports in the United States, or in a Territory, district, or possession thereof, to foreign markets, which are, or may be, determined by the Commission to be essential for the promotion, development, expansion, and maintenance of the foreign commerce of the United States, and in reaching its determination the Commission shall consider and give due weight to the cost of maintaining each of such steamship lines, the probability that any such line cannot be maintained except at a heavy loss disproportionate to the 'benefit accruing to foreign trade, the number of sailings and types of vessels that should be employed in such lines, and any other facts and conditions that a prudent business man would consider when dealing with his own business, with the added consideration, however, of the intangible benefit the maintenance of any such line may afford to the foreign commerce of the United States and to the national defense;
(b) The type, size, speed, and other requirements of the vessels, including express-liner or super-liner vessels, which should be employed in such services or on such routes or lines, and the frequency and regularity of the sailings of such vessels, with a view to furnishing adequate, regular, certain, and permanent service;
(c) The relative cost of construction of comparable vessels in the United States and in foreign countries;
*748 (d) The relative cost of marine insurance, maintenance, repairs, wages and subsistence of officers and crews, and all other items of expense, in the operation of comparable vessels in particular services, routes, and lines under the laws, rules, and regulations of the United States and under those of the foreign countries whose vessels are substantial competitors of any such American service, route, or line;
*****
Sec. 601. (a) The Commission is authorized and directed to consider the application of any citizen of the United States for financial aid in the operation of a vessel or vessels, which are to be used in an essential service in the foreign commerce of the United States. No such application shall be approved by the Commission unless it determines that (1) the operation of such vessel or vessels in such service, route, or line is required to meet foreign-flag competition and to promote the foreign commerce of the United States, and that such vessel or vessels were built in the United States, or have been documented under the laws of the United States not later than February 1, 1928, or actually ordered and under construction for the account of citizens of the United States prior to such date; (2) the applicant owns, or can and will build or purchase, a vessel or vessels of the size, type, speed, and number, and with the proper equipment required to enable him to operate and maintain the service, route, or line, in such manner as may be necessary to meet competitive conditions, and to promote foreign commerce; (3) the applicant possesses the ability, experience, financial resources, and other qualifications necessary to enable him to conduct the proposed operations of the vessel or vessels as to meet competitive conditions and promote foreign commerce; (4) the granting of the aid applied for is necessary to place the proposed operations of the vessel or vessels on a parity with those of foreign competitors, and is reasonably calculated to carry out effectively the purposes and policy of this Act.
(b) Every application for an operating-differential subsidy under the provisions of this title shall be accompanied by statements disclosing the names of all persons having any pecuniary interest, direct or indirect, in such application, or in the ownership or use of the vessel or vessels, routes, or lines covered thereby, and the nature and extent of any such interest, together with such financial and other statements as may be required by the Commission. All such statements shall be under oath or af *749 firmation and in such form as the Commission shall prescribe. Any person who, in an application for financial aid under this title or in any statement required to be filed therewith, willfully makes any untrue statement of a material fact, shall be guilty of a misdemeanor.
Sec. 602. No contract for an operating-differential subsidy shall be made by the Commission for the operation of a vessel or vessels to meet foreign competition, except direct foreign-flag competition, until and unless the commission, after a full and complete investigation and hearing, shall determine that an operating subsidy is necessary to meet competition of foreign-flag ships.
Sec. 603. (a) If the Commission approves the application, it may enter into a contract with the applicant for the payment of an operating-differential subsidy determined in accordance with the provisions of subsection (b) of this section, for the operation of such vessel or vessels in such service, route, or line for a period not exceeding twenty years, and subject to such reasonable terms and conditions, consistent with this Act, as the Commission shall require to effectuate the purposes and policy of this Act, including a performance bond with approved sureties, if such bond is required by the Commission.
(b) Such contract shall provide that the amount of the operating-differential subsidy shall not exceed the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense in which the Commission shall find and determine that the applicant is at a substantial disadvantage in competition with vessels of the foreign country hereinafter referred to, in the operation under United States registry of the vessel or vessels covered by the contract, over the estimated fair and reasonable cost of the same items of expense (after deducting therefrom any estimated increase in such items necessitated by features incorporated pursuant to the provisions of section 501 (b)) if such vessel or vessels were operated under the registry of a foreign country whose vessels are substantial competitors of the vessel or vessels covered by the contract.
(c) The amount of such subsidy shall be determined and payable on the basis of a final accounting made as soon as practicable after the end of each year or other period fixed in the contract. The Commission may provide for in the contract, or otherwise approve, the payment from time to time during any such period of such amounts on account as it deems proper. Such payments *750 on account shall in no case exceed 75 per centum of the amount estimated to have accrued on account of such subsidy, except that, with respect to that part of the subsidy relating to any particular voyage, an additional 15 per centum may be paid to the contractor after such contractor’s .audit of the voyage account for such voyage has been completed and the Commission’s auditors have verified the correctness of the same. Any such payments shall be made only after there has been furnished to the Commission such security as it deems to be reasonable and necessary to insure refund of any overpayment.
No such operating-differential subsidy shall be paid until the contractor shall have furnished evidence satisfactory to the Commission that the wages prescribed in accordance with subsection 301(a) of this Act have been paid to the ship’s personnel.
* $ # * ‡
Sec. 606. Every contract for an operating differential subsidy under this title shall provide * * * (5) that when at the end of any ten-year period during which an operating-differential subsidy has been paid under a contract or consecutive contracts (such period to be computed from the end of the operator’s last completed recapture period regardless of its duration, or from the beginning of subsidized operations if the operator has not previously completed a recapture period), or when prior to the end of such ten-year period subsidized operations shall be finally terminated, if the net profit of the contractor on his subsidized vessels and services incident thereto during such period or time (without regard to capital gains and capital losses), after deduction of depreciation charges based upon a life expectancy of the subsidized vessels determined as provided in section 607(b), has averaged more than 10 per centum per annum upon the contractor’s capital investment necessarily employed in the operation of the subsidized vessels, services, routes, and lines, the contractor shall pay to the United States an amount equal to one-half of such profits in excess of 10 per centum per annum as partial or complete reimbursement for operating-differential subsidy payments received by the contractor for such recapture period, but the amomit of excessive profit so recaptured shall not in any case exceed the amount of the operating-differential subsidy payments theretofore made to the contractor for such period under such contract or consecutive contracts and the repayment of such reimbursement to the Commission shall be subject to the provisions of section 607; * * *.
*751 Sec. 607. (a) Every contract for an operating differential subsidy made under authority of this title shall provide that the contractor shall be entitled to annually withdraw from net earnings of subsidized vessels and services incident thereto as profit, if the contractor is a natural person or a partnership, or may pay to its shareholders or stockholders, as dividends, if the contractor is an association or corporation, a sum not in excess of 10 per centum per annum on the contractor’s capital necessarily employed in his business, except subject to the further provisions of this section which likewise shall be incorporated in such contract.
(b) To insure the prompt payment of the contractor’s obligations to the United States and the replacement of the contractor’s subsidized vessels as may be required, the contractor shall create and maintain, out of gross earnings, during the life of such contract, a “capital reserve fund,” in such depository or depositories as may be approved by the Commission. In this fund the contractor shall deposit annually or oftener, as the Commission may require, an amount equal to the annual depreciation charges on the contractor’s vessels on which the operating differential is being paid, such depreciation charges to oe computed on a twenty-year life expectancy of the subsidized vessels, except that the life expectancy of a vessel which shall have been or is to be wholly or partially reconstructed or reconditioned shall upon request be determined jointly by the Secretary of the Treasury and the Commission, and the depreciation charges on such vessel shall be computed on the life expectancy so determined: Provided, however, That if, during any accounting year; the annual depreciation charges on the contractor’s line of subsidized vessels has not been earned, in whole or in part, over and above the annual expense of operation of such vessels (exclusive of said annual depreciation thereon), the contractor shall not be required to deposit in his capital reserve fund for such accounting year a sum in excess of the amount of annual depreciation actually earned during that year but shall make up any and all deficiencies in his capital reserve fund as soon as the earnings of his subsidized vessels in excess of annual expenses of operation shall permit. The proceeds of all insurance and indemnities received by the contractor on account of total loss of any subsidized vessel and the proceeds of any sale or other disposition of such vessel shall also be deposited in the capital reserve fund.
The contractor shall also deposit in the capital reserve *752 fund, from time to time, such percentage of the annual net profits of the contractor’s business covered by the contract as the Commission shall determine is necessary to further build up a fund for replacement of the contractor’s subsidized ships; but the Commission shall not require the contractor to make such deposit of the contractor’s net profits in the capital reserve fund unless the cumulative net profits of the contractor, at the time such deposit is to be made, shall be in excess of 10 per centum per annum from the date the contract was executed. From the capital reserve fund so created, the contractor may pay the principal, when due, on all notes secured by mortgage on the subsidized vessels and may make disbursements for the purchase of replacement vessels or reconstruction of vessels or additional vessels to be employed by the contractor on an essential foreign-trade line, route, or service approved by the Commission, but payments from the capital reserve fund shall not be made for any other purpose. The contractor may, with the consent of the Commission, pay from said fund any sums owing but not yet due on notes secured by mortgages on subsidized vessels.
(c) To attain the public objects for which the financial aid provided for in such contract is extended and to insure the continued maintenance and successful operation of the subsidized vessels, the contractor shall create and maintain, during the life of such contract, a “special reserve fund.” in such depository or depositories as the Commission shall approve.
If the profits, without regard to capital gains and capital losses, earned by the business of the subsidized vessels and services incident thereto exceed 10 per cen-tum per annum and exceed the percentage of profits deposited in the capital reserve fund, as provided in subsection (b) of this section, the contractor shall deposit annually; such excess profits in this reserve fund. From the special reserve fund the contractor may make the following disbursements and no others:
(1) Keimbursement to the contractor’s general funds for any losses on the operation of the subsidized vessels and services incident thereto sustained subsequent to the execution of the operating-differential-subsidy contract;
(2) Keimbursement to the contractor’s general funds for current operating losses on completed voyages of subsidized vessels whenever the Commission shall determine it is improbable that such current losses will be made up by profits on other voyages during the current year;
*753 (3) Payment of amounts due from the contractor to the Commission for reimbursement as provided in clause 5 of section 606, but such reimbursement shall be deferred until the amount on deposit in the special reserve fund shall be sufficiently in excess of 5 per centum of the capital necessarily employed in the business so that payment of such reimbursement to the Commission will not reduce the special reserve fund below a sum equal to such 5 per centum of capital necessarily employed in the business: Provided, That such reimbursement to the Commission, if so deferred, shall be payable upon termination of the contract from any amounts then in the special reserve fund and the capital reserve fund: Provided further, That if any amounts shall have been transferred to the general funds of the contractor from either of such reserve funds and not repaid thereto, or if prepayments of amounts not due before one year after the date of termination of the contract have been made from the capital reserve fund pursuant to subsection (b) of this section, then the balance of such reimbursement not paid out of said reserve funds shall be payable out of any other assets of the contractor, but the amounts so payable from such assets shall not exceed in the aggregate the sum of the amounts so transferred and not repaid, and the amounts of such prepayments;
(4) After reimbursement to the contractor’s general funds of all operating losses has been made, as provided in clause 1, and after reimbursement to the Commission of all amounts due from the contractor, as determined under clause 5 of section 606, if the amount accumulated in the special reserve fund shall then be in excess of 5 per centum of the capital necessarily employed in the business, the contractor may, if the Commission approves, withdraw some or all of such excess reserve and pay the sum so withdrawn into the contractor’s general funds or distribute the sum so withdrawn as a special dividend to the contractor’s shareholders or stockholders or as a bonus to officers or employees, as the contractor may determine.
(d) The Commission shall adopt and prescribe rules and regulations for the administration of the reserve funds contemplated by this section and shall include therein a definition of the term “net earnings” and the term “capital necessarily employed in the business,” as such terms are employed in this section: Provided, however, That the term “net earnings” shall take into account as a proper accounting charge to operation of vessels expense, an annual depreciation charge on the vessels, *754 computed on the economic life of the vessel as provided in section 607(b) and the term “capital necessarily employed in the business” shall not include borrowed capital.
Upon application of the contractor, the Commission, in its discretion, may permit the investment by the operator of some or all of the contractor’s capital and special reserve fund in approved interest-bearing securities, approved by the Commission, upon condition that the interest on such securities shall be deposited in the capital reserve fund.
*****
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).

 The corporate status originated in 1901 under the laws of Delaware. The name was changed in November 1938.

 49 Stat. 1985.

 46 U.S.C. § 1111, note.

 This provision was contained in Part I, paragraph 14(c), of the Agreement. The symbols “I — 14-c” are used in the parties’ requested findings and briefs as a shorthand designation of the provision.

 Plaintiff’s accounting Rad not been Anally closed, on October 5, 1951, as to either subsidy or tax payments.

 The provision is said to be discriminatory (1) because it applied to only two of the subsidized operators and (2) -because it was unreasonably retroactive, having been made applicable to a period of 1% years which commenced 5% years and ended 4 years prior to its promulgation.

 In the course of the trial, plaintiff abandoned, and withdrew from the petition, the suggested position that plaintiff accepted the provisions of I-14-c only as the result of economic coercion by Maritime.

 Defendant objects to all of plaintiff’s references to APE as a subsidized operator insofar as those references apply to the postwar period prior to October 5, 1951.

* The reasoning is that the intent and meaning of the contractual provisions (in Contract EMB-12) was that “the definition of capital necessarily-employed shall be that provided for in General Order 31 as amended by General Order 71.”

 49 Stat. 1985 ; 46 U.S.C. § 1101 et seg.

 A temporary operating differential subsidy contract between Maritime and Dollar, signed in January 1938, was replaced by the APL contract.

 Addenda Nos. 1 and 11-19, both Inclusive. The First Addendum changed the beginning date to October 1, 1938. All remaining amendments affected only the termination date.

 Commission action occurred on December 9, 1947. APL was advised of the action, informally on December 12, 1947, and formally on January 9, 1948.

 The Commission action consisted of the “[Approval of a further interim extension * * * with the understanding that * * [Emphasis supplied.] The “understanding” encompassed a stipulation that the operator would accept stated conditions relating to the computation of the subsidy payable under the contract.

 46 C.E.R. Part 286.

 46 C.P.R. Part 291.

 46 C.E.R. §§ 291.5(e)(8) and 291.5(g).

 The 12 operators were: American Export Lines, Inc.; American Mail Line, Ltd.; American President Lines, Ltd.; Farrell Lines, Inc.; Grace Line, Inc.; Lykes Bros. Steamship Co., Inc.; Mississippi Shipping Co., Inc.; Moore-McCormack Lines, Inc.; New York and Cuba Mail Steamship Co.; The Oceanic Steamship Co.; Seas Shipping Co., Inc.; and United States Lines Co.

 46 C.F.R. Part 286.

 Plaintiff’s operating differential subsidy contract was conditionally extended four times during the war, and again on December 29, 1945, to move the termination date forward to June 30,1946.

 Maritime had endeavored to provide for general resumption as of August 1, 1946. The results were not satisfactory.

 Plaintiff agreed on December 13, 1946. A few days later, on December 30, 1946, the termination date of plaintiff’s contract was extended, by the Seventeenth Addendum, to June 30, 1947.

 As of January 1, 1947, the 12 subsidized operators owned a total of only 155 ships (including those in nonsubsidized services) and held some $65 million in their capital reserve funds. During the ensuing 3 years these lines acquired approximately 100 ships, the equity of which represented about $100 million of capital translated into physical assets during the period. The operators urged upon Maritime the argument that capital reserve funds used to increase physical capital assets for use in subsidized operations were, in fact and in law, capital “necessarily employed in the business” on January 1, 1947, while temporarily awaiting such use.

 The Supplement 2 definition provided for the inclusion in capital necessarily employed of all balances in the capital reserve fund on account of outstanding mortgage indebtedness on subsidized vessels and permitted the inclusion of balances in the special reserve fund to the extent that they might be transferred to the capital reserve fund for the purpose of paying off mortgages on subsidized vessels or to meet commitments for new vessels. Also included were such standard, undisputed items as ship equities, reserves for depreciation, and amounts earmarked for down payments for vessel acquisitions and for working capital.

 Letter, plaintiff to Maritime, February 11,1947.

 Letter, Maritime to plaintiff, February 25, 1947. This letter contained the further advice that “a recommendation for the appropriate amendment of your agreement to cover the resumption of operations with subsidy, effective January 1, 1947, will be ready for presentation to the Commission for action at an early date.”

 These advices were repeated in substance on May 24, 1948, November 26, 1948, and May 13, 1949.

 As these vessels were nearing completion in September 1950, and before delivery, they were taken over by the Navy for use in the Korean war.

 With respect to the definition of capital necessarily employed, Maritime proposed that “the provisions of General Order 31 as amended from time to time shall continue applicable.’’

 In the mechanics of drafting the operating differential subsidy contracts and the various resumption addenda, Maritime divided the documents into Parts I and II. Part II was standard and uniform in each instance. Part I was tailored to the needs of the particular transaction.

 The staff of Maritime had been worhing on the new definition since the disapproval by Maritime, in November 1948, of the Supplement 2 definition.

 This action by Maritime represented its recognition of the long-on-cash, short-on-ships problem of the operators. The action permitted the net-worth definition of General Order 31 to apply, in most cases, during the period of much of the ship acquisitions. It had the further advantage, from the operators’ standpoint, of leaving undisturbed recapture and tax accounting for the 10-year recapture periods, as to which financial reports had been made.

 Seven recapture periods expired on December 31, 1947; three periods expired on December 31, 1948; one expired on December 31, 1949; and one expired on December 31, 1950.

 House Document No. 465, 81st Cong., 2d Sess.

 This report was preceded by a report by the Committee on Merchant Marine and Fisheries of the House of Representatives (House Report No. 3, 80th Cong., 1st Sess.) published January 3, 1947, wherein the Committee reviewed the actions of the Maritime Commission in defining capital necessarily employed and in regulating the operators’ uses of reserve funds, and concluded with (1) “criticism and censure” of the Commission on five counts and (2) a recommendation “that the Maritime Commission conduct its future operations in such manner as will prevent the possibility of subsidized or nonsubsidized operators obtaining greater benefits than the Congress has provided for them.”

 This was the 81st Congress, 2d Session.

 The fact is that Maritime intended, in 1946, and the operators knew of its intention, to adopt a revised definition, effective upon the resumption. When the definition in General Order 71 was submitted to the operators as a proposal, they expressed surprise amounting to shock at the terms of the definition, particularly as proposed for retroactive effect.

 House Report No. 2104, 81st Cong., 2d Sess.

 46 U.S.C. § nil, note.

 Finding 38(c).

 House Document No. 93, 82d Cong., 1st Sees.

 The staff memorandum was dated March 16, 1951. It was considered by the Board on March 2,7, and “decided” on April 3.

 A representative of plaintiff attended the meeting.

 These were: American Export Line, American President Lines, New York and Cuba Hail Line, and Oceanic Steamship Company.

 The staff also recommended that it be authorized to negotiate with the lines which had contracted prior to May 1, 1951, to obtain acceptance of the same rollback of General Order 71, and that the whole order be reviewed for appropriate revisions to be made effective prospectively from January 1, 1952.

 Inherent in the arrangement -was the waiver of the 1947 subsidy in exchange for resolution of its recapture period (which terminated on December 31, 1947) under the terms of its original contract, which meant the application of General Order 81.

 After August 16, 1951, only plaintiff and one other operator (Oceanic Steamship Company) were in position to be affected by the proposed rollback.

 Decision was made 14 months later, on September 17, 1952.

 Oceanle’s recapture period expired on December 31, 1947. When tbe rollback was ultimately applied to it, tbe increase recapture amounted to approximately $43,8001.

 Plaintiff could not, however, submit vouchers for payment of subsidy for its operations after January 1, 1947, until after tbe execution of Contract EMB-12 on October 5, 1951. Meanwhile, on March 8, 1951, Maritime approved payment by plaintiff of a dividend to preferred stockholders.

 The issue was put to public bearing, submitted on May '5, 1952, decided in favor of subsidization on September 3, 19.52,; and on September 25, 19/52, by Addendum No. 1 to Contract FMB-12, the service was included in subsidized operations.

 Agreement was reserved in the resumption addendum, as had been the case in the original operating differential subsidy contract, as to the replacement program, by a clause making the undertaking by plaintiff of a replacement program satisfactory to Maritime, a condition to continued subsidization.

 «* * * That we are barred by contractual obligations from applying uniformly a definition which we believe to be sound does not justify * * * the granting to the non-contracting operators a definition which we would not have favored were we in the original proceeding. Considerations favoring a sound rule outweigh the considerations of uniformity when uniformity carries with it the extension of the rule which * * * does not represent a reasonable solution of the problems faced in 1946.” Document No. 73, Joint Stipulation, p. 256, at p. 275^

 “The new rule * * * is applicable only to those * * * non-contracting operators whose resumption addenda, dated subsequent to May 1>, 1951, expressly gave the Board a free hand in the matter of promulgating a new definition of ‘Capital Necessarily Employed,’ including a new effective date.” Id.

 Nothing was cited suggesting any matters of shipping economics or practice, or differences in routes, financing, or operation, to warrant differentiation.

 The audit report emphasized the earlier recommendation by the Government Operations Subcommittee of the Committee on Expenditures in the Executive Departments of the House of Representatives that “the effective date of the revised definition be again reviewed * *

 Finding 38.

 Finding 43.

 Finding 33.